VICENTE BALBÁS PEÑA, peticionario y recurrente, *v.* ADMINISTRACIÓN DE SERVICIOS AL CONSUMIDOR, demandada y recurrida.

*Número:* O-75-396     *Resuelto:* 5 de mayo de 1976

*Daniel Pellón Lafuente*, abogado del peticionario; *Wilfredo López Irizarry, Reynaldo Rodríguez Pagán, Rosa E. Palou, Yusif Mafuz Blanco, Samuel Mártir Santiago* y *Migdalia Fraticelli,* abogados de la recurrida.

EL JUEZ ASOCIADO SEÑOR DÍAZ CRUZ emitió la opinión del Tribunal.

El peticionario, dueño de solares en la Barriada Gandul de Santurce, ocupados con edificaciones pertenecientes a terceras personas, tiene dichos solares cedidos en arrendamiento a los inquilinos desde fecha anterior al 1ro. de octubre de 1942 y así inscritos en la primera agencia reguladora de alquileres que lo fue la Oficina de Administración de Precios. A una solicitud de aumento de rentas por el dueño de solares peticionario, la Administración, luego de considerar alternativas para regirse por el Art. 6(g)(2) o el Art. 6(i) de la Ley de Alquileres Razonables (17 L.P.R.A. secs. 186(g)(2) y 186(i),([1]) optó

---

([1]) *Art. 6(g)(2)*

"El alquiler máximo de un solar en el cual hay edificaciones enclavadas pertenecientes a dueño distinto al del solar, se determinará tomando como base el valor de tasación del solar para fines contributivos elevado al 100%; entendiéndose que en ningún caso dicho alquiler máximo computado por una anualidad, excederá del doce (12) por ciento de dicho valor de tasación; disponiéndose, que no se podrá aumentar el alquiler máximo de un solar que haya sido declarado de utilidad pública por alguna ley en vigor."

por esta última. Su decisión fue confirmada en recurso de revisión por el Tribunal Superior y de esta actuación se recurre ante nos en *certiorari*.

La decisión administrativa, al supeditar el uso y disfrute de su propiedad por el peticionario a unos valores prevalecientes para el 1ro. de octubre de 1942 plantea la endeblez constitucional de este método de congelación de rentas con abstracción de los cambios económicos y especialmente los índices de costo operados en 34 años.

En el año 1946 cuando se aprobó la Ley de Alquileres Razonables (Ley Núm. 464 de 25 de abril de 1946, Leyes de ese año, pág. 1,327 y ss.) bajo una exposición de motivos que puso en relieve la concentración de una gran parte de las tierras en manos de corporaciones y una minoría de grandes terratenientes, bajo nivel de salarios e ingresos, especulación en el arrendamiento de viviendas y solares que imponía alquileres injustos, irrazonables y abusivos y "miles de familias pobres [que] enclavan sus viviendas en solares ajenos, por los cuales cobran sus dueños actualmente [1946] alquileres opresivos", se dispuso por la Asamblea Legislativa la aplicación del control de rentas a "solares en que radican viviendas pertenecientes a otras personas" (Art. 4(c)), pero desde esa temprana fecha estos solares fueron objeto de regulación especial en el estatuto estableciéndose para ellos una excepción

---

*Art. 6 (i)*

"El Administrador tendrá poderes para decretar aumentos o rebajas en el alquiler básico o en el alquiler fijado en aquellos casos en que a juicio suyo así se justifique, por razón de mejoras capitales, adición de espacio, aumento o reducción de mobiliario, equipo o accesorios, aumento o reducción en los servicios suministrados o en el costo de éstos, deterioro de la propiedad de alquiler o aumento en las contribuciones; disponiéndose que el Administrador no autorizará aumentos en los alquileres máximos por razón de mejoras capitales, adición de espacio, aumentos en servicios, equipos, muebles y accesorios, a menos que los mismos hubieren sido requeridos por propio inquilino, o a menos que el aumento en dichos servicios, equipos, muebles, accesorios, mejoras capitales o adición de espacio ocurriese mientras la propiedad se encontraba vacante."

que los saca del rasero de estabilización al nivel que prevalecía el 1ro. de octubre de 1942 (Art. 3) conocido como "alquiler básico". Consideró el legislador que la situación de emergencia que se propuso enfrentar y remediar haciendo uso de su poder de reglamentación "y en cumplimiento de su obligación de velar por el bienestar, la salud y la seguridad del pueblo", toleraba un tratamiento especial para estos solares para los que desde un principio creó un régimen de excepción.

La Ley de Alquileres Razonables, Ley Núm. 464 de 25 de abril de 1946, confirió autoridad al Administrador de Precios para aumentar la renta o alquiler de solares con edificaciones ajenas hasta un máximo equivalente al 12% del valor de tasación de dichos solares, independientemente de si estaban o no arrendados antes del 1ro. de octubre de 1942.

El Art. 6, en su texto original del año 1946, disponía que *excepto* en la forma que más adelante proveía, no podría cobrarse un alquiler mayor del que se pagaba el 1ro. de octubre de 1942. Entre las excepciones que dicho artículo autorizaba están comprendidas las siguientes dos: (1) Se le conferían poderes al Administrador para fijar el alquiler razonable *en todos los casos* en que a su juicio el alquiler prevaleciente al 1ro de octubre de 1942, o el que se hubiera fijado después de esa fecha, fuese excesivo, irrazonable u opresivo. (2) La segunda excepción autorizada por el citado Art. 6 que queríamos señalar está expresada en los siguientes términos:

"En caso de que procediere la determinación del alquiler razonable de *un solar* en el que estuviera enclavada una vivienda o una edificación destinada a negocios, o propósitos comerciales o industriales, y dicha vivienda o edificación perteneciera a distinto dueño, el alquiler razonable del solar arrendado no podrá exceder del doce (12) por ciento del valor de tasación del mismo, según la clasificación de las propiedades que a ese efecto haga el Administrador." Art. 6, párr. 10, Ley 464 de 1946, Leyes de ese año, págs. 1337–39. (Bastardillas nuestras.)

Como puede verse, las disposiciones citadas leídas en conjunto—como es necesario leer la ley—autorizaban al Administrador a aumentar y a reducir, según fuese el caso, el alquiler establecido antes o después del año 1942 si el mismo resultaba excesivo, irrazonable u opresivo. En el caso de un solar con edificación ajena autorizaba a aumentarlo hasta un 12% del valor de tasación del solar. Si bien puede argumentarse que el término "excesivo" incluye solamente alquileres demasiado altos, los términos "irrazonable u opresivo" incluyen tanto alquileres excesivamente altos como excesivamente bajos. *Coel* v. *Policlínica Arzuaga*, 100 D.P.R. 445, 450 (1972).

Debe observarse también que la disposición relativa a solares con edificación ajena no tenía limitación alguna en cuanto a la fecha de su aplicación, por lo que cubría a todo solar arrendado antes o después del 1942. En cuanto a viviendas construídas o alquiladas después del año 1942, el Art. 6 proveía para que el alquiler se fijase a base de alquileres similares a los que prevalecían en dicho año.

La regulación especial de la renta de solares con edificaciones pertenecientes a distinto dueño sufre una interrupción, de la que más tarde ha de reponerse, cuando en 1947 por Ley Núm. 37 de 22 de julio de ese año, Sesión Extraordinaria, pág. 141,[2] se eliminó la facultad del Administrador para establecer un alquiler hasta un 12% de la tasación del solar, disponiéndose en cambio que los solares se regirían por las normas relativas a edificaciones. En el año 1964 el citado Art. 6 fue objeto de varias enmiendas mediante la Ley Núm. 67 de 19 de junio de dicho año. Una de dichas enmiendas incluye en su texto a los solares sin edificaciones y autoriza a

---

[2] Esta enmienda de 1947 al Art. 6 de la Ley de Alquileres ordenó textualmente: "La fijación del alquiler básico o el alquiler razonable de un solar en el que estuviere enclavada una edificación perteneciente a dueño distinto al del solar se regirá por las normas fijadas por esta Ley para viviendas, o para edificaciones dedicadas a fines de comercio, negocio o industrias, según fuere el caso."

fijarles un alquiler máximo equivalente al 8% del valor de tasación de los mismos. Inexplicablemente se omitió en dicho nuevo Art. 6 lo relativo a solares con edificaciones ajenas.

Mediante la Ley Núm. 98 de 26 de junio de 1965 se subsanó esa omisión. Al Art. 6(g) relativo a solares sin edificaciones se le añadió un segundo párrafo relativo a solares con edificaciones ajenas. Mediante dicho segundo párrafo, Art. 6(g)(2), se restableció la facultad que en el año 1946 se le había conferido al Administrador para fijar alquileres de solares con edificación ajena hasta un máximo equivalente al 12% del valor de tasación. *Leyes* (1965), pág. 257.

De manera que en lo relativo a solares arrendados antes del 1ro de octubre de 1942 se restableció el valor de tasación como elemento básico en una de las excepciones que el Art. 6 autoriza para fijar un alquiler mayor que el que se pagaba el 1ro. de octubre de 1942.

El propio texto de la ley, según este ha ido evolucionando, demuestra que el Art. 6(g)(2) se aplica a todo solar con edificación ajena, independientemente de la fecha en que se alquiló por primera vez. Dice textualmente el Art. 6(g), incisos (1) y (2):

"(1) El alquiler máximo de un solar en el cual no hay edificaciones enclavadas, se determinará tomando por base el valor de tasación del solar para fines contributivos, elevado al 100%; entendiéndose que en ningún caso dicho alquiler máximo computado por una anualidad, excederá del ocho (8) por ciento de dicho valor de tasación.

(2) El alquiler máximo de un solar en el cual hay edificaciones enclavadas pertenecientes a dueño distinto al del solar, se determinará tomando como base el valor de tasación del solar para fines contributivos elevado al 100%; entendiéndose que en ningún caso dicho alquiler máximo computado por una anualidad, excederá del doce (12) por ciento de dicho valor de tasación; disponiéndose, que no se podrá aumentar el alquiler máximo de un solar que haya sido declarado de utilidad pública por alguna ley en vigor."

Que tal fue la intención legislativa surge también del Informe de la Comisión de Gobierno de la Cámara de Representantes, mediante el cual se recomendaron favorablemente las enmiendas del año 1965. En lo pertinente dicho Informe expresa:

"Art. 6g.—Esta disposición establece el procedimiento para determinar la renta máxima a solares en los cuales no hay edificaciones enclavadas. La enmienda sometida añade el párrafo (2) el cual *establece el procedimiento que debe usarse* para determinar la renta máxima a solares en que hay edificaciones enclavadas pertenecientes a dueños distintos al de los solares." 19 *Diario de Sesiones* 1721. (Bastardillas nuestras.)

Ni en el citado Informe ni el nuevo inciso (2) se distinguió entre solares arrendados antes o después del 1ro. de octubre de 1942. Para abundar en cuanto a la intención legislativa, nótese que la Legislatura, mediante la citada Ley Núm. 98 de 1965, añadió dos oraciones al Art. 6(d), relativo a propiedades alquiladas después del 1ro. de octubre de 1942, para aclarar en forma explícita que dicho inciso (d) no aplicaría a solares con edificación ajena. Estos se regirían por la norma uniforme establecida en el Art. 6(g)(2) de la Ley. Sobre este extremo el propio Informe de la Comisión de Gobierno se expresa como sigue:

"Artículo 6d.—*La intención* de esta disposición fue establecer el procedimiento a seguirse en la fijación de alquileres máximos para propiedades de alquiler construídas antes del 1ro. de octubre de 1942, que no estaban arrendadas en esa fecha y que pertenecían al mismo dueño del solar. La enmienda propuesta aclara la disposición indicando que la misma no se aplica a solares de propietario distinto al de la estructura de modo que existe uniformidad en el criterio a utilizarse en la fijación de la renta a dicho solar con uno de los criterios seguidos en la fijación de la renta del solar cuando el solar y la estructura son del mismo dueño. Se concede el 12% anual de tasación para fines contributivos elevana al 100%." 19 *Diario de Sesiones* 1721. (Bastardillas nuestras.)

Aparece por tanto, en nuestra primera pieza legislativa sobre control de arrendamientos urbanos, la figura del 12% del valor de tasación como medida de alquiler razonable, en perfecta coexistencia con los altos propósitos de terminar con la especulación y "amparar convenientemente los derechos de los inquilinos" (Exposición de Motivos), y en lo que resalta como de mayor relevancia al caso de autos, ese límite del 12% no impresionó al legislador como opresivo o abusivo en la realidad económica del Puerto Rico de entonces. Si ese fue el criterio de razonabilidad adoptado al momento mismo de aprobación de este estatuto de protección social, no debe preocuparnos su impacto al aplicarlo hoy siguiendo el mandato del mismo Art. 6 (g) (2) (17 L.P.R.A. sec. 186 (g) (2)) que al mantener la excepción original para solares con edificaciones pertenecientes a dueño distinto ordena que su alquiler máximo "se determinará tomando como base el valor de tasación del solar para fines contributivos elevado al 100%; entendiéndose que en ningún caso dicho alquiler máximo computado por una anualidad, excederá del doce (12) por ciento de dicho valor de tasación." (3)

Adicionalmente confirma el legislador la regulación especial de estos solares en el inciso (d) del referido Art. 6 (17 L.P.R.A. sec. 186 (d)) en que se dispone el método de fijación de renta "sobre la base de los alquileres prevalecientes *en el momento de la determinación,* para propiedades de alquiler similares y localizadas en zonas comparables que estaban arrendadas el 1ro de octubre de 1942", advirtiendo la Ley de inmediato: "Esta disposición no se aplica a solares cuando la edificación pertenece a propietario distinto al del solar. En este

---

(3) El argumento durante la vista oral reveló que los aumentos resultantes de este cómputo son moderados y están muy lejos de abrumar a los arrendatarios. La interpretación aquí adoptada preserva suficiente discreción en el Administrador de la agencia para moderar el aumento de la renta dentro de un marco de razonabilidad que sirva al inquilino y al propietario.

caso se determinará la renta del solar según la disposición del inciso (g) (2) siguiente." (Enfasis suplido.) Surge diáfana la intención legislativa de proteger a los inquilinos con casas en solares ajenos del canon mayor resultante de la actualización del alquiler tomando como base propiedades similares o comparables, que con el extraordinario incremento en el valor de la tierra en los últimos años fácilmente sobrepasaría la renta con un tope de 12% del valor de tasación, factor que se ha mantenido bajo. En este extremo la Ley, aún reiterando su protección al inquilino, la reconcilia con el derecho de propiedad del dueño del solar concediendo a éste el aumento discrecional que determine la agencia reguladora dentro del factor variable progresivo que es el 12% del valor de tasación.

▇ El historial legislativo excluye toda conclusión de que el Art. 6 (g) (2) cubre solamente solares arrendados después del 1ro. de octubre de 1942. Dicha disposición es la regla uniforme para fijar el alquiler máximo de solares con edificación ajena, sin limitación en cuanto a si fueron arrendados antes o después del 1ro. de octubre de 1942. Como dijimos, la enmienda de 1965 al Art. 6 (d) tuvo el propósito de mantener la excepción estatutaria para solares edificados pertenecientes a dueño distinto al de la estructura, ordenando la regulación de su renta a tenor del inciso (g) (2). Ley Núm. 98 de 26 de junio de 1965, págs. 256–7.

▇ Frente a la realidad de la evolución y vastos cambios en la economía de Puerto Rico del año 1942 a esta parte, el principio de igual protección de las leyes no tolera que los dueños de unos solares tengan el beneficio de cánones hasta un máximo del 12% del valor de tasación y que otros no, dependiendo de que unos arrendaron sus solares antes del 1942 y otros después, especialmente si esa distinción tiende a crear una clase o grupo de arrendatarios privilegiados.

Debe equilibrarse el preeminente interés social en proteger a una clase desvalida con el derecho del propietario a percibir

un canon razonable, sin que se incurra en privación que vulnere el debido proceso de ley, Art. II, Sec. 7, Constitución del Estado Libre Asociado; *cf. Agulló* v. *ASERCO*, 104 D.P.R. 244 (1975). Véanse, además, *Latoni* v. *Corte Municipal*, 67 D.P.R. 140, 151-152 (1947); Baar y Keating, *The Last Stand of Economic Substantive Due Process—The Housing Emergency Requirement for Rent Control*, 7 The Urban Lawyer 447 (1975); Hsia, *The ABC's of MBR: How to Spell Trouble in Landlord/Tenant Relations (Up Against the Crumbling Walls)*, 10 Columbia Journal of Law and Social Problems 113 (1974).

El alquiler máximo de estos solares en la Barriada Gandul ha de fijarse, por ministerio de ley, a tenor del Art. 6(g)(2) de la Ley de Alquileres. Esa es la única solución consistente con la protección del inquilino, la deseable uniformidad en disposiciones regulatorias y la reglamentación sin llegar al discrimen o clasificación arbitraria con grave erosión del derecho de propiedad que garantiza la Constitución. *Revocada.*

El Juez Presidente Señor Trías Monge disintió con opinión en la cual concurre el Juez Asociado Señor Torres Rigual. El Juez Asociado Señor Martín no intervino.

—O—

Opinión disidente emitida por el Juez Presidente, Señor Trías Monge, con la cual concurre el Juez Asociado, Señor Hiram Torres Rigual.

San Juan, Puerto Rico, a 5 de mayo de 1976

El peticionario es dueño de varios solares sitos en la barriada Gandul de Santurce, en los que existen edificaciones pertenecientes a los inquilinos de los mismos. Dichos solares estaban arrendados al 1 de octubre de 1942 y se les inscribió debidamente en la antigua Oficina de Administración de Precios de Puerto Rico.

En 1964 se aumentaron en 15% los cánones. Seis años más tarde el propietario solicitó un nuevo aumento. La Administración de Servicios al Consumidor concedió un aumento por razón del alza decretada en las contribuciones sobre la propiedad, utilizando el método prescrito en el Art. 6(i) de la Ley de Alquileres Razonables, Ley Núm. 464 de 25 de abril de 1946, según enmendada, 17 L.P.R.A. sec. 186(i).[1] El propietario solicitó la reconsideración de la orden y el 18 de agosto de 1971 la Administración revocó la misma, dictaminando que el incremento apropiado debía regirse en vez por las disposiciones del Art. 6(g)(2) de la referida Ley, 17 L.P.R.A. sec. 186(g)(2).[2] A tal efecto, tras el trámite correspondiente, se emitieron propuestas administrativas para la fijación de alquileres más altos. Se celebraron vistas para considerar la oposición de los inquilinos a los aumentos propuestos y la Administración resolvió el 28 de diciembre de 1972 revocar su Resolución de 18 de agosto de 1971 y ordenar aumentos en el alquiler básico exclusivamente por razón del

---

[1] El Art. 6(i) provee:

"El Administrador tendrá poderes para decretar aumentos o rebajas en el alquiler básico o en el alquiler fijado en aquellos casos en que a juicio suyo así se justifique, por razón de mejoras capitales, adición de espacio, aumento o reducción de mobiliario, equipo o accesorios, aumento o reducción en los servicios suministrados o en el costo de éstos, deterioro de la propiedad de alquiler o aumento en las contribuciones; disponiéndose que el Administrador no autorizará aumentos en los alquileres máximos por razón de mejoras capitales, adición de espacio, aumentos en servicios, equipos, muebles y accesorios, a menos que los mismos hubieren sido requeridos por propio inquilino, o a menos que el aumento en dichos servicios, equipos, muebles, accesorios, mejoras capitales o adición de espacio ocurriese mientras la propiedad se encontraba vacante."

[2] El Art. 6(g)(2) dispone:

"El alquiler máximo de un solar en el cual hay edificaciones enclavadas pertenecientes a dueño distinto al del solar, se determinará tomando como base el valor de tasación del solar para fines contributivos elevado al 100%; entendiéndose que en ningún caso dicho alquiler máximo computado por una anualidad, excederá del doce (12) por ciento de dicho valor de tasación; disponiéndose, que no se podrá aumentar el alquiler máximo de un solar que haya sido declarado de utilidad pública por alguna ley en vigor." ·

alza en las contribuciones. El propietario, tras agotar sus remedios administrativos, acudió al Tribunal Superior para revisar dicha Resolución de 28 de diciembre de 1972. El Tribunal Superior confirmó en su totalidad la referida Resolución y el propietario ha acudido ante nos en petición de *certiorari* en que solicita la revocación de la sentencia del Tribunal Superior y por ende de la Resolución de la recurrida de 28 de diciembre de 1972.

El peticionario formula esencialmente dos argumentos. Sostiene, en primer término, que la Administración de Servicios al Consumidor carecía de poder para dejar sin efecto su Resolución de 18 de agosto de 1971, la cual, a su juicio, se convirtió en final y firme. En segundo lugar plantea que las disposiciones que rigen este caso son las que prescribe el Art. 6 (g) (2) de la Ley de Alquileres Razonables y no las del Art. 6 (i).

I

El primer planteamiento del peticionario es inmeritorio. Aun cuando los inquilinos no solicitaron la reconsideración administrativa de la Resolución de 18 de agosto de 1971 dentro del término prescrito por ley (17 L.P.R.A. sec. 187; 23 L.P.R.A. sec. 1009; 3 L.P.R.A. sec. 341p), resulta incontrovertible que en ocasión de emitirse las propuestas administrativas de aumentos específicos, éstos presentaron oportunamente su oposición, habiéndose señalado y celebrado una vista a la cual comparecieron las partes.

En las circunstancias de autos, el dictamen de la agencia decidiendo que el incremento correspondiente debía regirse por las disposiciones del Art. 6 (g) (2) previamente citado, por su propia naturaleza no era final ni firme ya que exigía el trámite complementario sobre la determinación del monto apropiado de la renta. La oposición de los inquilinos en dicha etapa precisamente giraba sobre la cuantía del aumento a concederse, cuestión esta que no era susceptible de ser sepa-

rada de la determinación básica sobre cuál era la norma jurídica aplicable.

## II

No es válido tampoco el segundo planteamiento del peticionario. Existe una vital diferencia entre los Arts. 6(i) y 6(g) (2) de la Ley de Alquileres Razonables. La clave para la distinción se halla en el esquema general del estatuto y en los procesos que establece para la realización de sus propósitos. A tal fin es esencial observar que el estatuto delinea dos procedimientos muy distintos: el utilizable para la fijación del "alquiler básico" y el disponible para solicitudes de aumento o rebaja en alquileres existentes. La Ley de Alquileres Razonables emplea el vocablo "alquiler" en sentidos diferentes, dependiendo de cuál de los dos procedimientos se trate. *Pons* v. *Dir. Adm. S. Consumidor*, 99 D.P.R. 551 (1971); *Gual* v. *Suc. Sobrinos de A. Ribot*, 88 D.P.R. 159 (1963); *Aparicio* v. *Peñagarícano Admor.*, 84 D.P.R. 401 (1962). Debe distinguirse muy en particular entre los términos "alquiler básico", "alquiler comparable o prevaleciente" y "alquiler razonable". Los dos primeros se refieren al proceso de fijación de la renta. El tercero tiene que ver con la resolución de solicitudes de aumento o rebaja en alquileres ya fijados. *Mejías* v. *Tribunal Superior*, 82 D.P.R. 562 (1961).

El Art. 6(a) de la Ley, 17 L.P.R.A. sec. 186(a), define el concepto de "alquiler básico". A tal efecto expresa que:

"Excepto en la forma que más adelante se provee, a partir de la fecha de vigencia de las secs. 181 a 214a de este título, no podrá cobrarse un alquiler mayor del que se pagaba al primero de octubre de 1942. Este alquiler se conocerá como el 'alquiler básico'."

Como hemos visto, los solares objeto de esta controversia estaban arrendados al 1ro. de octubre de 1942. Fueron debidamente inscritos. Existía, por tanto, un alquiler básico para ellos. Fue, de hecho, el propósito inicial de la Ley, 17 L.P.R.A. sec. 181, entre otros, velar por la justicia de los alquileres en

que radicasen albergues pertenecientes o otras personas, distinto al caso de los solares yermos, cuyos alquileres no se controlaron hasta muchos años más tarde. *Pabón* v. *Marrero*, 91 D.P.R. 477, 480 (1964); *Carle Santiago* v. *Adm. de Estabilización Econ.*, 91 D.P.R. 65 (1964).

Cuando la propiedad no estaba arrendada al 1ro. de octubre de 1942, se recurre entonces al concepto de "alquiler prevaleciente o comparable" o a otros mecanismos para la fijación de la renta inicial. Dispone en tales circunstancias el Art. 6(d), 17 L.P.R.A. sec. 186(d):

"Si la propiedad de alquiler no hubiera estado arrendada el 1ro. de octubre de 1942, el Administrador fijará el alquiler sobre la base de los alquileres prevalecientes en el momento de la determinación, para propiedades de alquiler similares y localizados en zonas comparables que estaban arrendadas el 1ro de octubre de 1942. Hasta tanto el Administrador fije el alquiler correspondiente, el alquiler máximo de la propiedad será el primero cobrado. Esta disposición no se aplica a solares cuando la edificación pertenece a propietario distinto al del solar. En este caso se determinará la renta del solar según la disposición del inciso (g) (2) siguiente."

Adviértase que la función que cumple el Art. 6(g) (2) a que se hace referencia en esta disposición, así como la función del concepto "alquiler prevaleciente o comparable", es simplemente la de suplir un método sustituto para la fijación del alquiler básico cuando la propiedad no estaba arrendada al 1ro. de octubre de 1942. Vemos así que el Art. 6(g) (2), 17 L.P.R.A. sec. 186(g) (2), es parte del esquema de la Ley para la fijación de la renta inicial y no para su aumento o rebaja. Véase: *Mejías* v. *Tribunal Superior*, 82 D.P.R. 562 (1961).

El proceso de aumento o rebaja de un canon establecido se rige por el Art. 6(i), 17 L.P.R.A. sec. 186(i), antes transcrito, el que prescribe cuidadosamente las normas que deben

guiar la discreción administrativa en estos casos. El Art. 6(i) es el único que se refiere con toda precisión al aumento en el alquiler básico y sus sustitutos.

El historial legislativo de la Ley de Alquileres Razonables no sostiene la conclusión a que se llega en la opinión mayoritaria. En lo que toca a la versión original de la Ley de Alquileres Razonables, Ley Núm. 464 de 25 de abril de 1946, se hace hincapié en el décimo párrafo del Art. 6 del referido estatuto, en que se dispone que:

"En caso de que procediere la determinación del alquiler razonable de un solar en el que estuviera enclavada una vivienda o una edificación destinada a negocios, o propósitos comerciales o industriales, y dicha vivienda o edificación perteneciera a distinto dueño, el alquiler razonable del solar arrendado no podrá exceder del doce (12) por ciento del valor de tasación del mismo, según la clasificación de las propiedades que a ese efecto haga el Administrador."

Se omite hacer referencia, no obstante, al decimotercer párrafo del mismo artículo, en que se provee:

"El dueño de cualquier propiedad de alquiler podrá aumentar el canon de arrendamiento sobre el alquiler básico o el alquiler razonable fijado por el Administrador, previa autorización de éste, únicamente en caso de que se hayan hecho en la propiedad mejoras fundamentales, o se hayan aumentado sustancialmente los servicios o el mobiliario o se hayan impuesto contribuciones especiales o adicionales que ameriten el aumento en el canon."

Ambas disposiciones deben leerse en conjunto. Adviértase que, de leerse separadamente, se les hubiera estado dando trato privilegiadísimo a los dueños de solares en que enclavasen viviendas de otros pues según aumentase en valor su propiedad podrían reclamar aumentos de continuo, sin estar sujetos a las limitaciones impuestas a otros propietarios por el decimotercer párrafo del Art. 6. No existe indicio de que tal fuese la intención legislativa en 1946. Por lo contrario, lo que se revela es la grave preocupación de la Asamblea Legislativa,

expresada en la propia Exposición de Motivos, Art. 1 de la Ley Núm. 464 de 25 de abril de 1946, con el hecho de que "Miles de familias pobres enclavan sus viviendas en solares ajenos, por los cuales cobran sus dueños actualmente alquileres opresivos." A la luz de las realidades de entonces, es más razonable pensar que el décimo párrafo operaba como una limitación al decimotercero y no como escotilla de escape. Podía concederse un aumento en el canon del solar exclusivamente a la luz de los criterios expresados en el decimotercer párrafo, pero no podía exceder el aumento del doce por ciento de su valor de tasación. Vemos así cómo el actual Art. 6 (i) de la Ley halla su raíz en el antiguo decimotercer párrafo del mismo artículo. Es incorrecto, no obstante, visto lo que luego sucede, equiparar el actual Art. 6 (g) (2) con el antiguo párrafo décimo. De entonces para acá se identifica este último como método únicamente utilizable en el proceso de fijación inicial de la renta.

El primer cambio en este sentido ocurrió en 1947. La Ley Núm. 37 de 22 de julio de 1947 derogó el antiguo párrafo décimo, disponiéndose en vez que "La fijación del alquiler básico o el alquiler razonable en el que estuviere enclavada una edificación perteneciente a dueño distinto al del solar se regirá por las normas fijadas por esta Ley para viviendas o para edificaciones dedicadas a fines de comercio, negocio o industrias, según fuere el caso." *Leyes de Puerto Rico*, 1947, pág. 147. El párrafo decimotercero original no sufrió alteración, recalcándose así la unidad en el método de aumento o rebaja a seguirse y la diferencia entre lo que constituye un "alquiler básico" (la definición de este término no se alteró) y lo que significa un "alquiler razonable".

Mediante la Ley Núm. 67 de 19 de junio de 1964 la Asamblea Legislativa reglamentó por primera vez los alquileres de solares yermos, *Leyes de Puerto Rico*, 1964, pág. 187, pero sin alterar el sistema de control vigente desde 1947 respecto al alquiler de solares en que enclavasen edificaciones ajenas. En

la opinión mayoritaria se califica de "omisión" esta reiterada negativa a extenderles trato preferente a los solares con edificaciones pertenecientes a otros. No hay nada en el historial legislativo, sin embargo, que justifique esta conjetura.

Tampoco existe base adecuada para decir que el propósito de la Ley Núm. 98 de 26 de junio de 1965, que es la que añade el Art. 6(g) a la legislación actual, fue subsanar esa "omisión". Por lo contrario, la conclusión opuesta es la que se deduce claramente del texto del Art. 6(d) presente, antes citado, cuyas dos últimas oraciones se añaden también en el 1965. Como hemos indicado ya, el Art. 6(d) demuestra que la función del Art. 6(g)(2) es tan solo la de servir de método sustituto al del alquiler comparable o prevaleciente para la fijación de renta a solares que no estaban arrendados al 1ro. de octubre de 1942. Los informes de comisiones y la parte del debate que se citan en modo alguno demuestran que la intención legislativa fue proveer un camino especial para atender las peticiones de aumento de los dueños de solares con edificaciones ajenas, mientras el resto de las propiedades tienen que sujetarse al procedimiento que ordena el Art. 6(i).

Se aduce el argumento, no obstante, que de interpretarse que la ley autoriza la fijación del alquiler básico en cierto modo en el caso de los solares con edificaciones ajenas arrendados al 1ro. de octubre de 1942 y de otro modo en el caso de solares arrendados posteriormente, pecaría de inconstitucional el estatuto. No es así. Toda congelación de alquileres exige por necesidad esta disparidad aparente. Si los métodos que se proveen para establecer el control deseado en el caso de propiedades que ingresen al mercado de alquileres en fecha posterior son razonables, la Asamblea Legislativa ha actuado dentro del amplio marco que el derecho constitucional le brinda en este sensitivo campo. En Estados Unidos se ha resuelto repetidamente que aun basta con que los alquileres que se fijen sean generalmente justos y equitativos, sin que se requiera como condición para la constitucionalidad de la ley que

se le garantice un alquiler razonable a cada casero en toda circunstancia concebible. *Bowles* v. *Willingham*, 321 U.S. 503, 516–518 (1944). *Bowles* y su numerosa progenie establecieron la constitucionalidad de las disposiciones relativas a alquileres de la Ley de Emergencia para el Control de Precios de 1942, 56 Stat. 23, c. 26, que es el estatuto de donde deriva fundamentalmente nuestra legislación actual. Para la declaración de constitucionalidad del control de alquileres durante la Primera Guerra Mundial, véase *Block* v. *Hirsh*, 256 U.S. 135 (1921). *Bowles* no es una reliquia jurídica. Su vitalidad es evidente en nuestros días. Véase, por ejemplo, la decisión en *Hutton Park Gardens* v. *Town Council of West Orange*, 350 A.2d 1 (N.J. 1975), en que se resuelve que el hecho de que los costos aumenten más rápidamente que los alquileres o aun que algunos propietarios sufran pérdidas no es suficiente *per se* para demostrar la existencia de confiscación inconstitucional.

Valga señalar, además, que nuestra ley provee un método específico—precisamente el que dispone el Art. 6 (i)— para proteger los intereses de tanto inquilinos como caseros cuando el alquiler fijado es irrazonable u opresivo. Bajo determinadas circunstancias muy especiales se puede estar privando a una persona o grupo de personas de su propiedad sin el debido proceso de ley. El medio para evitar una posible confiscación en el caso de los solares con edificaciones ajenas no es, sin embargo, la utilización de un remedio exclusivo, no accesible a los dueños de otras propiedades. Respetuosamente considero que el esquema de 1947, representado por el Art. 6 (i) y mantenido a todas luces hasta el presente, en que se provee un solo procedimiento y se establecen criterios generales para el aumento o rebaja de todo tipo de alquiler, es el más indicado. La determinación de que los dueños de solares tienen derecho a un tratamiento diferente bajo el Art. 6 (g) (2) plantea graves dificultades constitucionales, puede afectar adversamente a miles de familias y es, después de todo, innecesaria a los fines que se persiguen. El equilibrio de

intereses que el derecho ordena en estas circunstancias es evitar la privación de propiedad sin debido proceso de ley, asegurar la igual protección de las leyes y proteger a los inquilinos de alquileres opresivos. Este objetivo puede lograrse, no obstante, sin acudir al establecimiento de la norma excesivamente amplia y preñada de posibles injusticias de constituir el Art. 6(g)(2) en peligrosa excepción de lo prescrito en el Art. 6(i). El mercado de alquileres en Puerto Rico continúa en condiciones críticas. Negrón Medero, T.: *Situación del Mercado de Alquileres en Puerto Rico para los años 1940 y 1970*, 36 Rev. C. Abo. P.R. 583 (1975). El equilibrio deseado puede alcanzarse, con justicia a ambas partes, mediante la oportunidad que se le ofrece al casero dentro del propio Art. 6(i) de demostrar que el alquiler fijado no es razonable.

Valga apuntar que el dueño peticionario en este caso no ha planteado la inconstitucionalidad *per se* de aspecto alguno de la Ley de Alquileres Razonables ni ha presentado la prueba necesaria para emitir juicio sobre si la aplicación de disposición alguna del estatuto tiene el efecto de privarle de su propiedad sin debido proceso de ley, cuestión que tampoco suscita. En tales circunstancias estimo que este Tribunal no está en condiciones todavía, especialmente a la luz de *Bowles*, de pronunciarse sobre estos extremos.

Por las razones expuestas confirmaría la sentencia de que se recurre, sin perjuicio de que el peticionario formule y documente las alegaciones que desee sobre los efectos que pueda entrañar la aplicación a su caso del Art. 6(i) de la Ley de Alquileres Razonables.